UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  08/15/2015
```

-------------------------------------------------------------------X
                                                                   :
UNITED STATES OF AMERICA,                                          :
                                                                   :
                        -v-                                        :          15-CR-272 (JMF)
                                                                   :
JOSE DIAZ,                                                         :          OPINION AND ORDER
                                                                   :
                                    Defendant.                     :
                                                                   :
-------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

 Defendant Jose Diaz, charged with one count of being a felon in possession of a firearm

in violation of Title 18, United States Code, Section 922(g) (Docket No. 6), was arrested after a

police officer encountered him drinking alcohol in the stairwell of an apartment building and a

search revealed that he was in possession of a firearm.  He now moves to suppress the firearm on

the ground that it was obtained in violation of his rights under the Fourth Amendment to the

United States Constitution.  (Docket No. 9).  Diaz's motion presents two difficult legal

questions: first, whether the stairwell in which he was drinking qualifies as a "public place"

within the meaning of New York City's "open-container" law, which generally prohibits

drinking alcohol in public places; and second, whether, in light of *Knowles v. Iowa*, 525 U.S. 113

(1998), a search is reasonable under the Fourth Amendment if a police officer has probable cause

to arrest a person but elects to issue a summons or citation instead of effecting an arrest and, but

for the fruits of search itself, would not have arrested the person.

 Diaz has strong arguments on both fronts, but his motion ultimately fails.  First, applying

recent Supreme Court precedent, the Court concludes that it need not decide whether the

stairwell at issue is a "public place" within the meaning of New York City's open-container law

— an issue upon which New York's own courts are divided.  That is because, even assuming *arguendo* that the police officer was mistaken in believing that the stairwell qualified as a "public place" for purposes of the open-container law, that belief was objectively reasonable and provided her with probable cause to arrest Diaz.  Second, applying binding Second Circuit precedent, the Court holds that whether the officer intended to arrest Diaz at the time of the search is irrelevant and that the search was lawful because the officer had probable cause to arrest Diaz and the search was substantially contemporaneous with the arrest.  The Second Circuit's precedent is certainly in tension, if not conflict, with the Supreme Court's decision in *Knowles*.  But it is the prerogative of the Second Circuit (or the Supreme Court), not this Court, to decide if it remains good law in light of *Knowles*.  Ultimately, notwithstanding the strong arguments in Diaz's favor, the Court concludes that it is bound by the Second Circuit's precedent.  Accordingly, and for the reasons stated below, Diaz's motion must be and is denied.

## BACKGROUND

As noted, Diaz is charged in a one-count indictment with possessing a firearm having previously been convicted of a felony after a police officer's search revealed that he was carrying a gun.  On June 19, 2015, he moved to suppress the evidence seized as a result of the search — including the gun — on the ground that it was obtained in violation of the Fourth Amendment. (Docket No. 9).  Disputing several facts alleged by the Government — most notably, that he was holding a cup and drinking alcohol — Diaz argued that the officer could not lawfully search him incident to his arrest because there was no probable cause to arrest him for a crime.  (Jose Diaz's Mem. Law Supp. His Mot. To Suppress Physical Ev. (Docket No. 10) ("Diaz Mem.") 2-4; *id.*, Ex. D ("Diaz Aff.")).  The Government opposed Diaz's motion, but conceded the need for an evidentiary hearing.  (Gov't Mem. Law Opp. Def. Jose Diaz's Mot. To Suppress Physical Ev. &

Statements (Docket No. 11) ("Gov't Mem.") 2).  Accordingly, on July 24, 2015, the Court held a hearing at which the Government called as witnesses the two police officers involved in the incident, Officers Chris Aybar and Jose Espinal, and Diaz testified on his own behalf.  (July 24, 2015 Tr. (Docket No. 20) ("Tr.") 3, 49, 78).  The Court finds that the Officers largely testified credibly and, with one prominent exception discussed below, therefore credits their version of events.  By contrast, the Court does not find that Diaz's testimony was credible to the extent that it conflicted — as it did significantly — with the Officers' testimony.  In light of those credibility determinations, the Court makes the following findings of fact.

On the night of March 21, 2014, Officers Aybar and Espinal were conducting a foot patrol in the 42nd police precinct in the Bronx, New York.  (Tr. 3-4, 78-79).  At some point late that night, the Officers entered 584 East 167th Street, a four- or five-story apartment building, to conduct a "vertical" patrol as part of the New York City Police Department's "Clean Halls" program.  (Tr. 4-5, 20, 79; *see also* Jose Diaz's Post-Hrg. Mem. Law Supp. His Mot. To Suppress Physical Ev. (Docket No. 18) ("Diaz Supp. Mem.") 9 (asserting that the apartment building had twelve units, not fifteen as Diaz had testified at the suppression hearing)).  A "vertical" patrol is one in which the Officers move, floor by floor, through a building, checking for trespassing or other illegal activity.  (Tr. 4-5).  *See generally United States v. Pitre*, No. 05-CR-78, 2006 WL 1582086, at *1 (S.D.N.Y. June 6, 2006) (describing the process of conducting a vertical).  As Officer Aybar — who has been a police officer for approximately a year and a half — explained it, the Clean Halls program is "when management from the building want officers to go inside the building and look for any trespassing or any violations occurring inside the building."  (Tr. 3, 5, 20).  *See generally People v. Powell*, 691 N.Y.S.2d 263, 265 (Sup. Ct. 1999) (describing the Clean Halls program).

The Officers gained entry to the building through the front door, which was propped open.  (Tr. 5, 22).  Immediately thereafter, the Officers detected "an odor of marijuana."  (Tr. 5).  They then proceeded up the stairs to the third-floor landing, a "small area" where they saw three men: Diaz, Joshua Knox, and Collin Maloney.  (Tr. 6-8, 79, 82; *see also* Gov't Ex. ("GX") 1; Diaz Supp. Mem. 8).  Knox was on the landing, leaning against a wall while Diaz and Maloney were seated on the stairs going up to the fourth floor.  (Tr. 8, 25).  Officer Aybar observed all three men holding red Solo — that is, opaque plastic — cups; on the floor, near Diaz, she observed a partially empty New Amsterdam peach vodka bottle.  (Tr. 9-12, 14, 26, 30, 81; GX 2).  In addition, Knox was holding both a lit marijuana cigarette and a box with what turned out to be eleven "roaches" — that is, the remains of other marijuana cigarettes.  (Tr. 14, 23).  Officer Aybar instructed all three men to stand against the wall, which they did, apparently without incident.  (Tr. 12, 13, 31, 58-59, 82).  As she approached Diaz, she detected "a strong odor of alcohol."  (Tr. 12, 17, 27-29).  In addition, she examined the cup that Diaz had been holding, and observed that it held a small amount of clear liquid that also smelled like alcohol.  (Tr. 28).  At that point, Officer Aybar intended to issue Diaz a summons for violating New York City's open-container law, which was her uniform practice in such situations.  (Tr. 18, 32-33).  As she explicitly testified, she had no intention of arresting him.  (Tr. 32-33).

When Diaz was by the wall, Officer Aybar asked him for identification.  (Tr. 12, 17, 32, 41-42).  In response to her request, Diaz began fumbling in the pockets of the jacket he was wearing, as if to retrieve something (albeit not, in Officer Aybar's view, his identification); he also touched, or rearranged, his waistband.  (Tr. 17, 38-39, 41-42; *see also* Tr. 79-80).  "[F]eel[ing]" unsafe, Officer Aybar immediately proceeded to "frisk" Diaz and discovered in the pocket of his jacket a loaded .380 caliber Tauras handgun.  (Tr. 19, 42).  At that point, Officer

4

Aybar arrested Diaz for unlawful possession of a firearm.  (Tr. 33).  Later, at the precinct, she

also gave him a summons for violating the open-container law.  (Tr. 15, 33; GX 5A; Gov't Mem.

3).  On the summons, Officer Aybar recorded that Diaz had said "I was just drinking."  (Diaz

Mem., Ex. C (summons)).  At the hearing, she reaffirmed that he had made that statement, but

she did not recall when he had done so.  (Tr. 28-29).[1]

As noted, the Court does decline to credit Officer Aybar's testimony in one critical

respect.  After the Government's redirect examination, in response to additional questioning by

the Court, Officer Aybar testified that Diaz "refused to give" his identification to her when

asked, telling her that "he didn't have an ID."  (Tr. 42-43).  That testimony was potentially

significant because Officer Aybar had earlier testified that in the event someone who had

committed an open-container violation did not have identification, she "would have to" arrest

him or her "and verify who they were."  (Tr. 18-19; *see also* Tr. 43).  The Court, however, is not

prepared to find that Diaz refused to provide identification.[2]  First, Officer Aybar did not

mention Diaz's alleged refusal until the Court's questions.  That is, she did not mention it in her

state grand jury testimony, which took place only days after the incident; she did not mention it

---

[1]     As noted, Diaz's account of what happened on the landing is significantly different.
Among other things, he testified that: he was not holding a red Solo cup or drinking (Tr. 56); he
immediately produced his driver's license when Officer Aybar asked him for identification, and
she then used her radio to check if he had any open warrants (Tr. 59-60); Officer Aybar then
asked for his jacket, which he was holding over his arm not wearing, and searched it.  (Tr. 59-
61).  Diaz also denies that he ever said that he "was just drinking."  (Diaz Aff. ¶ 8).  Based on the
demeanor of the witnesses, and some consistencies between the testimony of Officer Aybar and
Officer Espinal (the latter of whom admittedly did not observe or recall much regarding Diaz as
he was focused primarily on Knox (Tr. 80, 83-84)), the Court declines to credit Diaz's account.

[2]     To be clear, the Court need not, and does not, find that Officer Aybar — who otherwise
testified credibly — lied (*i.e.*, knowingly testified falsely) when she said that Diaz explicitly
refused to provide identification when asked.  Whether that testimony was the result of a
mistake, faulty memory, or knowing falsehood, however, the bottom line is that the Court
declines to credit it.

in any of her meetings with either the state prosecutor or the Assistant United States Attorney; and she did not mention it in her testimony on direct examination, cross-examination, and redirect, despite having testified in detail about the (brief) encounter and being asked "what, if anything, in total, did Mr. Diaz say?"  (Tr. 28, 44-47).  Even assuming (as Officer Aybar claims (Tr. 44, 47-48)) that she was never asked a question that specifically called for that information, the failure to disclose such an obviously significant statement by Diaz is hard to fathom.  Second, although Officer Aybar had testified that she would have had to arrest Diaz for violating the open-container law if he did not have identification (Tr. 18-19, 43), she unambiguously admitted that "it was only after [she] found the gun in Mr. Diaz's pocket" — which indisputably happened after any exchange about identification — that she "decided to physically arrest him."  (Tr. 33).

To the extent relevant here, the bottom line is that the Court finds that, at the time that Officer Aybar search Diaz, she did not intend to arrest him for violating the open-container law (and, as discussed below, she had no basis to arrest him for anything else).  Instead, her sole intention at the time of the search was merely to issue Diaz a summons.  It was only after the search revealed the gun — and *because* the search revealed that gun — that Officer Aybar placed Diaz under arrest, and only for unlawful possession of a firearm.

## BACKGROUND LEGAL PRINCIPLES

The background legal principles relevant to this case are not in dispute.  The Fourth Amendment exists to protect "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.   As its language indicates, the Amendment's "ultimate touchstone . . . is 'reasonableness.'"  *Riley v. California*, 134 S. Ct. 2473, 2482 (2014).  It is well established that a warrantless search is "*per se* unreasonable under the Fourth Amendment — subject only to a few specifically established

and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967). One well-recognized exception relevant to this case allows "an investigating officer to briefly detain an individual for questioning . . . 'if the officer has a reasonable suspicion that criminal activity may be afoot.'" *United States v. Vargas*, 369 F.3d 98, 101 (2d Cir. 2004) (quoting *United States v. Colon*, 250 F.3d 130, 134 (2d Cir. 2001)); *see also Terry v. Ohio*, 392 U.S. 1, 30 (1968). During such an investigatory stop, "[t]he investigating officer may also frisk an individual for weapons if the officer reasonably believes that person to be armed and dangerous." *Colon*, 250 F.3d at 134; *see, e.g.*, *Terry*, 392 U.S. at 27 ("[T]here must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime.").

Another exception to the warrant requirement relevant here is the search-incident-to-arrest doctrine, which permits police officers to perform a search of a person in connection with a lawful arrest. *Riley*, 134 S. Ct. at 2482-83. As the Supreme Court has explained, the search-incident-to-arrest doctrine serves the twin purposes of "protecting arresting officers and safeguarding any evidence of the offense of arrest that an arrestee might conceal or destroy." *Arizona v. Gant*, 556 U.S. 332, 339 (2009). Those interests are assumed to be present whenever an officer effects an arrest and, thus, need not be demonstrated on a case-by-cases basis. *Riley*, 134 S. Ct. at 2483. Significantly, a search incident to an arrest may take place before the arrest itself "as long as probable cause to arrest existed at the time of the search." *United States v. Jenkins*, 496 F.2d 57, 72-73 (2d Cir. 1974) ("The mere fact that the trooper reversed the procedure, conducting the search before the arrest, did not render it illegal . . . . Any other holding would, without rational basis, exalt form over substance."); *see Rawlings v. Kentucky*,

448 U.S. 98, 111 (1980) (stating that, "[w]here the formal arrest follow[s] quickly on the heels of the challenged search," it is not "particularly important that the search preceded the arrest rather than vice versa").  To be "incident to" an arrest, however, the search and arrest must be "substantially contemporaneous."  *Shipley v. California*, 395 U.S. 818, 819 (1969).

Finally, for purposes of the Fourth Amendment, a lawful arrest requires probable cause.  *See, e.g.*, *Virginia v. Moore*, 553 U.S. 164, 177 (2008).  Probable cause "exists when the officers have knowledge of, or reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested."  *Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007).  Probable cause "is a fluid concept," *Florida v. Harris*, 133 S. Ct. 1050, 1056 (2013) (internal quotation marks omitted), which is not "readily, or even usefully, reduced to a neat set of legal rules," *United States v. Falso*, 544 F.3d 110, 117 (2d Cir. 2008) (internal quotation marks omitted).  It is well established, however, that "[p]robable cause is to be assessed on an objective basis."  *Zellner*, 494 F.3d at 369.  Thus, "an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause."  *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004); *see Whren v. United States*, 517 U.S. 806, 812-13 (1996) (reviewing cases).  Further, "an officer's 'subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause.'"  *Zellner*, 494 F.3d at 369 (quoting *Devenpeck*, 543 U.S. at 153).  Put simply, an arrest — and, by extension, a search incident to arrest — "is not unlawful so long as the officer has knowledge of, or reasonably trustworthy information as to, facts and circumstances sufficient to provide probable cause to believe that the person arrested has committed any crime."  *Id.*

## DISCUSSION

In this case, the Government seeks to justify the search of Diaz principally on two grounds: on the basis of "reasonable suspicion" and as a search incident to arrest.  (Gov't Mem. 9-11; Gov't's Post-Hrg. Mem. Law Opp. Def. Jose Diaz's Mot. To Suppress Physical Ev. & Statements (Docket No. 19) ("Gov't Supp. Mem.") 13; Tr. 89-90).[3]  The former — which the Government argued for the first time (and only half-heartedly at that) after the evidentiary hearing was held (Tr. 89-90) — can be swiftly rejected.  To justify a search, an officer must have a reasonable suspicion, based on "specific and articulable facts," that the suspect is "armed and dangerous."  *Terry*, 392 U.S. at 21, 27; *see also, e.g.*, *United States v. Bailey*, 743 F.3d 322, 332 (2d Cir. 2014) ("A reasonable basis requires more than a hunch.  Rather, it demands specific and articulable facts which, taken together with rational inferences from those facts, provide detaining officers with a particularized and objective basis for suspecting wrongdoing." (internal citations and quotation marks omitted)).  The Government argues that Officer Aybar had such a reasonable suspicion because Diaz responded to her request for identification by fidgeting, trying to take off his coat, and touching his waistband.  (Tr. 90; *see id.* at 42).  But those facts do not suffice to establish reasonable suspicion.  *See, e.g.*, *United States v. Bellamy*, 592 F. Supp. 2d 308, 318 (E.D.N.Y. 2009) ("[F]urtive behavior absent additional indicia of suspicion generally does not suffice to establish reasonable suspicion." (citing *Reid v. Georgia*, 448 U.S. 438, 440-41 (1980)); *United States v. Doughty*, No. 08-CR-375 (RPP), 2008 WL 4308123, at *5-6 (S.D.N.Y.

---

[3]     The Government also relies to some extent on exceptions for "inventory searches" and the inevitable discovery doctrine.  (Gov't Mem. 10-11; Gov't Supp. Mem. 13).  Those doctrines, however, add nothing here, as they apply only where a defendant was or would have been lawfully arrested.  *See Illinois v. Lafayette*, 462 U.S. 640, 643 (1983) (explaining that the defendant must have been "under lawful arrest" for the inventory search doctrine to apply); *United States v. Heath*, 455 F.3d 52, 60 (2d Cir. 2006) (assuming that the officers were "legally entitled to arrest" in order to apply the inevitable discovery doctrine).

Sept. 19, 2008) (holding that a suspect's "slid[ing] his hand along his waist" and adjusting his

waistband was insufficient to support a reasonable suspicion that he was armed and dangerous);

*cf. United States v. Sanders*, 208 F.3d 204 (2d Cir. 2000) (summary order) (finding that a

suspect's touching of his waistband supported a reasonable suspicion *because* it appeared to be

an attempt to hide or conceal something in the waistband).  Accordingly, the search was not

justified based on a reasonable suspicion that Diaz was armed and dangerous.

Thus, whether the search in this case was valid depends on whether it was a search

incident to a lawful arrest.  That, in turn, presents two questions: first, whether there was

probable cause to arrest Diaz at the time of the search; and second, if there was probable cause to

arrest Diaz at the time of the search, whether the search was nonetheless invalid insofar as

Officer Aybar had no intent to arrest Diaz until she found the gun — that is, until after the search

itself.  The Court will begin with the threshold question of probable cause.

## A.      Probable Cause

The Government contends that Officer Aybar had probable cause to arrest Diaz at the

time of the search for violation of New York City's "open-container" law.  *See* N.Y.C. Admin.

Code 10-125(b).[4]  That law provides that "[n]o person shall drink or consume an alcoholic

beverage, or possess, with intent to drink or consume an alcoholic beverage in any public place,"

subject to certain exceptions not relevant here.  N.Y.C. Admin. Code § 10-125(b); *see id.* § 10-

---

[4]        In addition, in its pre-hearing memorandum, the Government contended that there was
probable cause to believe that Diaz had been smoking marijuana.  (Gov't Mem. 8-9).  At the
hearing, however, Officer Aybar testified that she had no reason to believe that Diaz had touched
or smoked the marijuana, which was solely in the possession of Knox.  (Tr. 24; *see also* Tr. 32).
In light of that testimony, it is plain that Officer Aybar did not have probable cause to arrest Diaz
for possession of marijuana.  *See, e.g.*, *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979) ("[A] person's
mere propinquity to others independently suspected of criminal activity does not, without more,
give rise to probable cause.").

125(c) (providing that "[p]ossession of an open container containing an alcoholic beverage" creates "a rebuttable presumption" of intent to consume); *see also United States v. Davis*, — F. Supp. 3d —, No. 14-CR-0567 (MKB), 2015 WL 3990514, at *5 (E.D.N.Y. July 1, 2015) (noting that open-container violations are "arrestable offenses" under New York City law).  Here, although Diaz makes some argument to the contrary (Diaz Mem. 3), Officer Aybar indisputably had probable cause to believe that Diaz was drinking alcohol or possessing alcohol with the intent to drink it.  As noted, Officer Aybar observed Diaz holding a red Solo cup containing a clear liquid while sitting in close proximity to an open bottle of vodka.  (Tr. 9, 12).  In addition, she smelled alcohol on Diaz's breathe and in the cup he had been holding.  (Tr. 27-28).[5]  Those observations were more than sufficient to establish probable cause to believe that Diaz was drinking alcohol.  *See, e.g.*, *United States v. Hooks*, No. 10-CR-934 (RPP), 2011 WL 102726, at *5 (S.D.N.Y. Jan. 6, 2011) (finding probable cause to arrest where, among other things, the officer observed the defendant drinking out of a plastic cup and the defendant and the cup smelled of "strong liquor"); *People v. Bothwell*, 261 A.D.2d 232, 234 (App. Div. 1st Dep't 1999) (finding probable cause to arrest where the defendant was holding a Heineken bottle in a manner that "suggested that the bottle was not empty").

The more difficult question is whether the landing of the stairwell in which Diaz was drinking qualified as a "public place" within the meaning of the open-container law.  The open-container law defines "public place" as a "place to which the public or a substantial group of persons has access including, but not limited to, any highway, street, road, sidewalk, parking

---

[5]     The Court does not rely on Officer Aybar's testimony that Diaz told her that he "was just drinking."  (Tr. 28; *see* GX 5A).  At the suppression hearing, Officer Aybar could not recall when Diaz made that statement (Tr. 28-29), and thus there is no basis to conclude that it was made prior to the search.

area, shopping area, place of amusement, playground, park or beach," except for venues "duly

licensed" to serve alcohol.   N.Y.C. Admin. Code § 10-125(a)(2).  As Diaz rightly points out

(Diaz Mem. 3-4; Diaz Supp. Mem. 7), the list in the statute does not expressly include the

common areas of residential apartment buildings, such as lobbies or stairwells.  But that is

plainly not dispositive, as the core definition itself (any "place to which the public or a

substantial group of persons has access") is quite broad, and the expansive phrase "including, but

not limited to," makes clear that the list that follows is illustrative and not exhaustive.  Notably,

whether the definition applies to common areas of a residential apartment building is a question

that has divided New York courts.  *Compare People v. Medina*, 842 N.Y.S.2d 227, 232 (N.Y.

Sup. Ct. 2007) (holding that the lobby of an apartment building constitutes a "public place"

within the meaning of New York's open-container law), *with People v. Chavez*, 972 N.Y.S.2d

858, 862-63 (N.Y. Crim. Ct. 2013) (rejecting *Medina* and holding that an elevator within an

apartment building does not qualify as a "public place" within the meaning of the open-container

law); *see also United States v. Brown*, No. 07-CV-232 (JBW), 2007 WL 2121883, at *2-4

(E.D.N.Y. July 25, 2007) (following *Medina* and holding that a bodega is a "public place" within

the meaning of the open-container law).

  As *Chavez* makes clear, a compelling argument can certainly be made that the common

areas of residential buildings do not qualify as public places for purposes of the open-container

law — especially where, as here, the building in question is on the small end of the spectrum.

For one thing, the title of the statute refers to consumption of alcohol "on streets," and it is hard

to see how "the interior common areas of residential apartment buildings, often separated from

the streets by locked doors, intercoms, and 'no trespassing' signs, are part of the public streets."

972 N.Y.S.2d at 860.  Second, "[i]n clear contrast" to the open-container law, "multiple

provisions of the Administrative Code contain more expansive definitions of a 'public place' which expressly include the common areas inside apartment buildings." *Id.* (citing N.Y.C. Admin. Code § 10-136(a)(3) (prohibiting certain forms of solicitation); *id.* § 10-134.2(a)(3) (regulating possession of laser pointers); *id.* § 10-134.1(b)(3) (prohibiting possession of box cutters by anyone younger than twenty-one); *id.* § 17-502(p) (regulating smoking)). That is significant because, "where the Legislature 'includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that [the Legislature] acts intentionally and purposefully in the disparate inclusion or exclusion.'" *Rivers v. Birnbaum*, 102 A.D.3d 26, 36 (App. Div. 2d Dep't 2012) (quoting *INS v. Cardoza-Fonseca*, 480 U.S. 421, 432 (1987)) (other internal quotation marks omitted). And finally, "the law must provide residents with definite and comprehensive notice as to which acts are prohibited and which acts are lawful. This notice is especially important with regard to regulations on conduct within the common areas of apartment buildings, as these same areas have historically been considered both public and non-public, depending on the nature of the specific statutory prohibition." *Chavez*, 972 N.Y.S.2d at 862.

Ultimately, however, the Court need not resolve that unsettled question of state law because, even if Officer Aybar was mistaken in her belief that the stairwell qualified as a "public place" for purposes of the open-container law, her mistake was an objectively reasonable one. *See Heien v. North Carolina*, 135 S. Ct. 530, 536 (2014); *see also Herring v. United States*, 555 U.S. 135, 139 (2009) ("When a probable-cause determination was based on reasonable but mistaken assumptions, the person subjected to a search or seizure has not necessarily been the victim of a constitutional violation."). In *Heien*, an officer stopped a car for driving with only one functional tail light, believing that to be a violation of state traffic law, and, in a subsequent

search, found a significant quantity of cocaine.  *See* 135 S. Ct. at 534.  A state court, however, later concluded that driving with a single working tail light was not in fact a violation of state law.  *See id.* at 535.  Nevertheless, the Supreme Court concluded that the warrantless search was reasonable and thus consistent with the Fourth Amendment, holding that "reasonable suspicion can rest on a mistaken understanding of the scope of a legal prohibition."  *Id.* at 536.  "To be reasonable," the Court reasoned, "is not to be perfect, and so the Fourth Amendment allows for some mistakes on the part of government officials, giving them fair leeway for enforcing the law in the community's protection."  *Id.* (internal quotation marks omitted).  The Court emphasized, however, that the Fourth Amendment "tolerates only *reasonable* mistakes, and those mistakes . . . must be *objectively* reasonable."  *Id.* at 539; *see id.* at 540-41 (Kagan, J., concurring).

Indent *Heien* controls here, as even assuming *arguendo* that Officer Aybar's belief that the stairwell was a "public place" within the meaning of the open-container law was mistaken, her belief was not objectively unreasonable.[6]  That conclusion is all but compelled by the decision in *Medina*, which held that "the phrase 'public place' in Section 10-125(b) can, and does, include the common areas of apartment buildings to which substantial groups of persons have access." 842 N.Y.S.2d at 232.  Indeed, the mere fact that a state court has adopted that reading of the

---

[6]      Relying on dictum in *Flint v. City of Milwaukee*, — F. Supp. 3d —,  No. 14-CV-333 (JPS), 2015 WL 1261245, at *22 (E.D. Wis. Mar. 20, 2015), Diaz argues that *Heien* is limited to searches based on a reasonable suspicion and does not apply to searches based on probable cause (Diaz Reply Mem. 2), but that argument borders on frivolous.  Nowhere in *Heien* does the Court appear to recognize a distinction between searches based on probable cause and those based on reasonable suspicion.  To the contrary, the opinions in *Heien* — majority and dissenting — refer repeatedly to probable cause and cite many cases involving probable cause determinations. Indeed, much of the Court's reasoning in *Heien* was based on nineteenth-century cases establishing that reasonable mistakes of law could support a probable cause determination.  *See* 135 S.Ct. at 537; *id.* at 542-43 (Sotomayor, J., dissenting); *see also, e.g.*, *J Mack LLC v. Leonard*, No. 13-CV-808, 2015 WL 519412, at *9 (S.D. Ohio Feb. 9, 2015) (concluding that *Heien* applies equally to searches based on a reasonable suspicion and those based on probable cause).

statute — in a thorough opinion that appears, on its face at least, well reasoned (and, indeed, has been followed by at least one federal court) — makes it hard to say that the reading, even if it turns out to be mistaken, is objectively unreasonable.  But *Medina* aside, Officer Aybar's belief finds support not only in the breadth of the law's core definition (any "place to which the public or a substantial group of persons has access"), but also in the fact that the *exact same phrase* is used elsewhere in the Administrative Code and expressly defined to include the common areas of apartment buildings.  *See, e.g.*, N.Y.C. Admin. Code § 10-136(a)(3); *id.* § 10-134.2(a)(3); *id.* § 10-134.1(b)(3); *see also Riley v. Cnty. of Broome*, 95 N.Y.2d 455, 466 (2000) ("As a general principle of statutory construction, whenever a word is used in a statute in one sense and with one meaning, and subsequently the same word is used in a statute on the same subject matter, it is understood as having been used in the same sense." (internal quotation marks omitted)).

To be sure, the relatively small size of the building at issue here strengthens the argument that Officer Aybar committed an unreasonable mistake of law in believing that the stairwell qualified as a "public place."  After all, given that there were only twelve or fifteen units in the building, one could question whether the stairwell was "a place to which . . . a *substantial* group of persons" had "access."  N.Y.C. Admin. Code § 10-125(a)(2) (emphasis added).  But what constitutes a "substantial group of persons" is not defined in the statute, and the limiting modifier — "substantial" — is highly subjective.  It may be the case that the stairwell of an apartment building with only one or two units would not be accessible to a substantial group of persons, but a substantial group of persons could presumably access the stairwell in an apartment building with dozens or hundreds of units.  Where to draw the line — or, more to the point, which side of the line an apartment building with twelve or fifteen units would fall — is anything but clear. Accordingly, the Court cannot conclude that it was objectively unreasonable for Officer Aybar to

believe that the stairwell in which she encountered Diaz drinking vodka qualified as a "public place" for purposes of the open-container law.  It follows that even if her understanding of the open-container law was mistaken — an unsettled issue of state law that the Court need not, and does not, reach — that mistake was an objectively reasonable one and, in light of *Heien*, Officer Aybar had probable cause to arrest Diaz for violation of the law.

## B.    Incident to Arrest

That does not end the analysis, however, given the Court's finding that Officer Aybar would not have arrested Diaz but for the fact that she found a gun during the search.  That raises the question of whether a search can be viewed as "incident" to an arrest where, but for the search itself, the person who was searched would not have been arrested.  More precisely, it raises the question of whether a search is reasonable under the Fourth Amendment when a police officer has probable cause to arrest a person but elects to issue a summons or citation instead of effecting an arrest and, but for the fruits of search itself, there would have been no arrest.

The Second Circuit has squarely held that such a search is lawful.  *See United States v. Ricard*, 563 F.2d 45 (2d Cir. 1977).  In *Ricard*, a police officer stopped the defendant for speeding after observing him driving seventy-five miles per hour in a fifty-five-mile-per-hour zone.  *See id.* at 48.  During the stop, the officer observed a small tin foil packet; a search of the packet revealed a white powder that later proved to be cocaine.  *See id.* at 48-49.  On appeal, the Second Circuit held that the search of the packet was lawful because the officer had probable cause to arrest the defendant for speeding and that it did not matter whether he would have made the arrest in the absence of the search.  *See id.* at 49.  "Had the officer arrested appellant" for speeding, the Court reasoned, "he would . . . have been fully entitled to search him, even though the arrest was based on a simple traffic violation."  *Id.* (citing *United States v. Robinson*, 414

U.S. 218 (1973)).  It did not matter, the Court continued, that the officer "chose not to arrest appellant for the speeding violation, and the contested search was actually the cause of appellant's arrest. . . .  [T]he fact that [the officer] had cause to arrest appellant for speeding, *even if he initially determined not to do so*, was a sufficient predicate for a full search."  *Id.* (emphasis added) (citing *Jenkins*, 496 F.2d at 72-73, and *United States v. Riggs*, 474 F.2d 699, 702 (2d Cir. 1973)).  Quoting Judge Mansfield's opinion in *Jenkins*, the Court concluded that conducting the search before the arrest "did not render it illegal as long as probable cause to arrest existed at the time of the search. . . .  Any other holding would, without rational basis, exalt form over substance."  *Id.* (quoting *Jenkins*, 496 F.2d at 73) (alteration in original).

As Diaz conceded at oral argument, if *Ricard* remains good law, it controls here and, in light of the Court's holding above that there was probable cause to arrest Diaz at the time of the search, mandates the conclusion that the search was lawful.  (Tr. 102-03).  Whether *Ricard* remains good law, however, is open to some doubt after the Supreme Court's decision in *Knowles*.[7]  Like the defendant in *Ricard*, Knowles was stopped for speeding, an offense for which he could have been arrested under Iowa law.  *See* 525 U.S. at 114.  The officer, however, elected to issue Knowles a citation rather than making an arrest.  *See id.*  The officer then conducted a full search of the car, and found drugs, at which point he placed Knowles under arrest.  *See id.*  On appeal, the Iowa Supreme Court "upheld the constitutionality of the search

_____

[7]     The holding in *Ricard* is arguably also in tension with *Smith v. Ohio*, 494 U.S. 541 (1990) (per curiam), which held that "a warrantless search that provides probable cause for an arrest" cannot "be justified as an incident of that arrest."  *Id.* at 541.  In so holding, the Court stated that "justifying the arrest by the search and at the same time . . . the search by the arrest, just will not do. . . .  [I]t is axiomatic that an incident search may not precede an arrest and serve as part of its justification."  *Id.* at 543 (internal quotation marks and brackets omitted) (first alteration in original).  That language aside, however, *Smith* is distinguishable from *Ricard* (and this case) because the officer there did not have probable cause to arrest the defendant prior to conducting the search.

under a bright-line 'search incident to citation' exception to the Fourth Amendment's warrant requirement, reasoning" — much like the Second Circuit in *Ricard* — "that so long as the arresting officer had probable cause to make a custodial arrest, there need not in fact have been a custodial arrest." *Id.* at 115-16.  The Supreme Court reversed, holding that neither of the rationales underlying the search-incident-to-arrest doctrine justified the search of Knowles's car. *See id.* at 116-19.  With respect to the first rationale — officer safety — the Court reasoned that "[t]he threat to officer safety from issuing a traffic citation . . . is a good deal less than in the case of a custodial address," especially given "other, independent bases" that officers have "to search for weapons and protect themselves from danger" (such as conducting a "patdown" upon reasonable suspicion).  *Id.* at 117-18; *see also Moore*, 553 U.S. at 177 ("Officers issuing citations do not face the same danger, and we therefore held in *Knowles* . . . that they do not have the same authority to search.").  With respect to the second rationale — the need to discover and preserve evidence — the Court explained that "[o]nce Knowles was stopped for speeding and issued a citation, all the evidence necessary to prosecute that offense had been obtained." *Knowles*, 525 U.S. at 118.  The "remote" possibility of finding "evidence of another, as yet undetected crime" did not suffice.  *Id.*

Somewhat surprisingly, even though *Knowles* was decided almost seventeen years ago, the Second Circuit has never addressed the effects of the Supreme Court decision, if any, on *Ricard* and does not appear to have confronted a case that raises the question presented here.  (In fact, the Court of Appeals has cited *Knowles* and, since *Knowles* was decided, *Ricard* only once each, the latter in a non-precedential summary order that neither cited nor discussed the Supreme Court's decision.  *See United States v. Dhinsa*, 171 F.3d 721, 725-26 (2d Cir. 1998) (citing *Knowles*); *United States v. Wilson*, 94 F. App'x 14, 17 (2d Cir. 2004) (summary order) (citing

*Ricard*).)  The Supreme Court decision, however, indisputably casts some doubt on the soundness of *Ricard*.  After all, in both cases, the officers had probable cause to arrest the defendants for speeding; in both cases, the officers chose not to effect an arrest for speeding (at least initially); in both cases, the officers nevertheless conducted searches that revealed evidence of crimes; and in both cases, the defendants were then arrested — and subsequently prosecuted — for those crimes.  Yet while the Second Circuit held in *Ricard* that the search was lawful because the officer had probable cause to arrest the defendant and that it did not matter if the officer initially intended to effect an arrest, the Supreme Court ruled in *Knowles* that the search was unconstitutional.  Put simply, if the Second Circuit were correct that a search prior to an arrest is lawful "as long as probable cause to arrest existed at the time of the search," 563 F.2d at 49 (internal quotation marks omitted), then it would seem that *Knowles* should have come out the other way, as the officer there indisputably had probable cause to arrest the defendant at the time of the search.  *See* 525 U.S. at 114.

Although the Second Circuit has not confronted a case like this one since *Knowles*, the New York Court of Appeals has and, while obviously not binding on this Court, its decision is illuminating.  *See People v. Reid*, 24 N.Y.3d 615 (2014).  In *Reid*, an officer stopped the defendant based on probable cause to believe that he was driving while intoxicated, an arrestable offense.  *See id.* at 617-18.  During the stop, the officer conducted a patdown of the defendant, found a switchblade knife in his pocket, and proceeded to arrest him.  *See id.* at 618.  At a pretrial hearing, the officer acknowledged — just as Officer Aybar did in this case — that he did not intend to arrest the defendant until he conducted the search and found the switchblade knife. *See id.*  Nevertheless, the lower courts upheld the search, holding — like the Second Circuit in *Ricard* — that "so long as probable cause to arrest . . . existed, it was irrelevant whether [the

officer] subjectively intended to make such an arrest." *Id.* A divided New York Court of

Appeals reversed. The Court acknowledged "that, before conducting the search, [the officer]

could lawfully have arrested defendant for driving while intoxicated" and "that the search was

not unlawful solely because it preceded the arrest, since the two events were substantially

contemporaneous." *Id.* at 618-19 (citing *Rawlings*, 448 U.S. at 111). "The problem," the Court

explained "is that . . . but for the search there would have been no arrest at all." *Id.* at 619.

Given that, the Court continued, "to say that the search was incident to the arrest does not make

sense. It is irrelevant that, because probable cause existed, there *could* have been an arrest

without a search. A search must be incident to an actual arrest, not just to probable cause that

might have led to an arrest, but did not." *Id.*

   Notably, the Court concluded that *Knowles* was "controlling." *Id.* As the Court

explained:

> If a search could be justified by an arrest that, but for the search, would never
> have taken place, the Supreme Court would not have decided *Knowles* in the way
> it did. In *Knowles* as in this case, there was probable cause to make an arrest, and
> there was a search, followed immediately by an arrest. The problem, in *Knowles*
> as here, was that the search caused the arrest and not the other way around. In
> *Knowles*, this fact was proved by the officer's choice, before conducting the
> search, not to arrest defendant for speeding but to issue him a citation. Here, [the
> officer] made a similar choice not to arrest defendant for drunken driving, a fact
> proved by the officer's testimony.

*Id.* at 620. The Court thus held that "the 'search incident to arrest' doctrine, by its nature,

requires proof that, at the time of the search, an arrest has already occurred or is about to occur.

Where no arrest has yet taken place, the officer must have intended to make one if the 'search

incident' exception is to be applied." *Id.*; *see also Bennett v. City of Eastpointe*, 410 F.3d 810,

824 (6th Cir. 2005) ("The mere fact that an officer has the *authority* to arrest an individual does

not, and never has, automatically permit[] the officer to conduct a pat-down search should he

choose *not* to effectuate the arrest. *Knowles*, 525 U.S. at 117-19. For an officer to conduct a search incident to arrest, there must be an *actual arrest*."); *Davis*, 2015 WL 3990514, at *7 & n.7 ("A search incident to arrest need not necessarily occur after formal arrest to be valid, but the argument that the search was incident to arrest becomes more strained when the facts show that a defendant would not have been arrested but for the fact that the search produced evidence of a crime . . . . [S]ome courts have recently noted that a search incident to arrest becomes problematic when, but-for the search, there would have been no arrest." (citing cases, including *Knowles* and *Reid*)).

Were this Court writing on a blank slate or not bound by Second Circuit precedent, it might well agree with the majority in *Reid*, in which case Diaz's motion would have to be granted given the Court's finding that Officer Aybar did not intend to arrest Diaz until the search that revealed the gun. But — as Diaz conceded — the Second Circuit has spoken directly to the issue presented by this case, and this Court is required to follow that decision "unless and until it is overruled in a precedential opinion by the Second Circuit itself or 'unless a subsequent decision of the Supreme Court so undermines it that it will almost inevitably be overruled by the Second Circuit.'" *Doscher v. Sea Port Grp. Sec., LLC*, No. 15-CV-384 (JMF), 2015 WL 4643159, at *3 (S.D.N.Y. Aug. 5, 2015) (quoting *United States v. Emmenegger*, 329 F. Supp. 2d 416, 429 (S.D.N.Y. 2004)). Thus, "[t]he precise question for this Court . . . is not whether, by its own analysis," *Knowles* supports the conclusion reached by the New York Court of Appeals in *Reid*. *Emmenegger*, 329 F. Supp. 2d at 429. Instead, it is whether *Knowles* "so conclusively supports that finding that the Second Circuit or the Supreme Court is all but certain to overrule" *Ricard*. *Id.*; *see also Monsanto v. United States*, 348 F.3d 345, 351 (2d Cir. 2003) (noting that district courts and the Second Circuit itself are "required to follow" a Second Circuit decision,

even if it is in "tension" with subsequent Supreme Court precedent, "unless and until that case is reconsidered by [the Second Circuit] sitting in banc (or its equivalent) or is rejected by a later Supreme Court decision"); *United States v. Wong*, 40 F.3d 1347, 1373 (2d Cir. 1994) ("[U]ntil the Supreme Court rules otherwise, the district court would be obliged to follow our precedent, even if that precedent might be overturned in the near future.").

The Court cannot conclude that, in light of *Knowles*, "the Second Circuit or the Supreme Court is all but certain to overrule" *Ricard*, *Emmenegger*, 329 F. Supp. 2d at 429, let alone that those Courts would necessarily rule in favor of Diaz on these facts. Once again, the New York Court of Appeals decision in *Reid* is instructive, but this time the Court turns to the dissent. As the dissent in *Reid* noted, the majority's holding — that whether a search before an arrest is valid turns on whether the officer intended to effect an arrest at the time of the search — is in considerable tension, if not conflict, with the well-established principle "that an arresting officer's subjective intent, however determined, offers no basis for negating an objectively valid arrest." 24 N.Y.3d at 621 (Read, J., dissenting). Indeed, the Supreme Court has "repeatedly rejected a subjective approach" in the Fourth Amendment context. *Fernandez v. California*, 134 S. Ct. 1126, 1134 (2014) (internal quotation marks omitted); *see, e.g.*, *Bingham City v. Stuart*, 547 U.S. 398, 405-07 (2006) (exigent circumstances search); *Devenpeck*, 543 U.S. at 153-54 (probable cause to arrest); *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (reasonable suspicion to perform a *Terry* stop); *Graham v. Connor*, 490 U.S. 386, 397 (1989) (excessive force); *see generally Whren*, 517 U.S. at 813 ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."). As the Supreme Court has explained, categorical rules "provide clear guidance to law enforcement," *Riley*, 134 S. Ct. at 2491, and help ensure that similarly situated defendants are treated the same, without regard for the experience or

knowledge of the particular officer involved or the vagaries of post hoc judicial factfinding, *see Devenpeck*, 543 U.S. at 153-54.  The logic of the *Reid* majority opinion aside, it is hard to imagine that the *Knowles* Court intended to create an exception to that well-founded long line of authority, let alone that it would have done so without explicitly acknowledging it.  *See also Dhinsa*, 171 F.3d at 725-26 (discussing *Knowles* immediately after a lengthy discussion of *Whren* and the irrelevance of an officer's subjective intent to the Fourth Amendment inquiry, without any suggestion that *Knowles* calls for a different approach).

Additionally, the Supreme Court or the Second Circuit could distinguish *Knowles* from this case in at least two ways.  First, *Knowles* could be limited to routine traffic stops (or similarly routine encounters).  *See, e.g.*, *United States v. Pratt*, 355 F.3d 1119, 1124 n.4 (8th Cir. 2004) ("[W]e question the applicability of *Knowles* outside the area of routine traffic stops.").  After all, the Court's conclusion that the two rationales for the search-incident-to-arrest doctrine did not justify the search in *Knowles* were based in large part on the fact that the officer had conducted a routine traffic stop.  *See* 525 U.S. at 117-18.  Those rationales — officer safety and the need to discover and preserve evidence — indisputably apply more strongly where, as here, an officer confronts multiple people in a confined space, there is probable cause to believe that one or more of them has committed a more serious offense (here, possession of marijuana and violation of the open-container law), and additional evidence of those crimes might "be found . . . on the person of the offender."  *Id* at 518.  Second, as the Government notes (Gov't Supp. Mem. 2-5 (citing cases)), courts — including one in this Circuit — have held that *Knowles* applies only where an officer has already issued a citation at the time of the search.  *See, e.g.*, *United States v. Chauncey*, 420 F.3d 864, 872 (8th Cir. 2005); *Pratt*, 355 F.3d at 1124 n.4; *Evans v. Solomon*, 681 F. Supp. 2d 233, 250-51 & n.12 (E.D.N.Y. 2010) (following *Ricard* and

distinguishing *Knowles*).  Although one could argue that such an approach would (to borrow the

Second Circuit's own words), "without rational basis, exalt form over substance," *Ricard*, 563

F.2d at 49 (quoting *Jenkins*, 496 F.2d at 73), it would have the virtue of making the inquiry turn

on objective facts (albeit objective facts that are, of course, dictated by the officer's subjective

decision-making).  Additionally, where, as here, a search takes place in the course of a dynamic,

potentially unpredictable confrontation between the police and an offender — not to mention, at

a point when the offender has no way to know whether he is about to be arrested or merely

issued a citation — the two rationales for the search-incident-to-arrest doctrine would seem to

apply with greater force than they did on the facts in *Knowles*.

In short, while *Knowles* is indisputably in tension with *Ricard*, the Court cannot

unequivocally find that the Supreme Court or the Second Circuit would overrule *Ricard* in light

of *Knowles*.  Accordingly, the Court remains bound by *Ricard* and, in light of its finding that

there was probable cause to arrest Diaz for violation of the open-container law, the Court is

compelled to conclude that the search of Diaz was lawful.

## CONCLUSION

For the reasons stated above, Diaz's motion must be denied.  He makes a compelling

argument that the stairwell was not a "public place" within the meaning of the open-container

law, but — given, among other things, the New York State court decision in *Medina* — the

argument is not strong enough to defeat a finding of probable cause in light of *Heien*.  And while

there are reasons to question the soundness of *Ricard* in the wake of *Knowles*, that is an issue for

the Second Circuit (or the Supreme Court), not this Court.  This Court is bound by *Ricard* unless

and until the decision is overruled by a higher court and, as Diaz himself concedes, that dictates

the outcome of this case given the Court's holding as to probable cause.

Accordingly, Diaz's motion to suppress is DENIED.  The Clerk of Court is directed to terminate Docket No. 9.

    SO ORDERED.

Date:   August 14, 2015
        New York, New York

                                        _____
                                        JESSE M. FURMAN
                                        United States District Judge